BROWN, Administrator, Office of Price Administration, v. KRAMER et al.
No. 1160.

District Court, M. D. Pennsylvania.
March 26, 1943.

360

Russell J. O'Malley, and Paul F. Gibbons, both of Scranton, Pa., and Alexander F. Whelan, of New York City, for plaintiff.

Harold A. Scragg, and Joseph Marzzacco, both of Scranton, Pa., for defendant.

WATSON, District Judge.

In the complaint in this action brought by the Office of Price Administration the defendants, Jacob Kramer and Herman Kramer, are alleged to be slaughterers under the provisions of "An Act to expedite national defense, and for other purposes", and, as such slaughterers, slaughtered substantial numbers of cows, heifers, bulls, steers and calves, and delivered the "controlled meats" produced thereby in violation of Restriction Order Number 1 promulgated pursuant to the provisions of said Act, and that, unless restrained by order of this Court, immediate and irreparable injuries will result to the public and to the war effort.

An order was entered directing the defendants to appear and show cause why a temporary injunction, such as prayed for in the complaint, should not be granted. Hearing was held on said order to show cause and, from the testimony at said hearing, the facts are found to be as follows:

Findings of Fact

1. The plaintiff is the Administrator of the Office of Price Administration.

2. The defendants are residents of Scranton, Pennsylvania, within the Middle District of Pennsylvania.

3. The defendants are "slaughterers" within the provisions of Restriction Order Number 1, Section 1407.901(j), promulgated pursuant to Section 2(a) of Public Law 671, Act June 28, 1940, 54 Stat. 676, as amended, 41 U.S.C.A. note preceding section 1.

4. The defendants' quota of "controlled meat" of the type described as "beef" in Restriction Order Number 1, did not exceed 226,483 lbs. for quota period number 1, extending from October 1, 1942, to December 31, 1942.

5. The defendants' quota of "controlled meat" of the type described as "veal" in Restriction Order Number 1 did not exceed 227,394 lbs. for quota period number 1, extending from October 1, 1942, to December 31, 1942.

6. The defendants' quota of "controlled meat" of the type described as "beef" in Restriction Order Number 1, did not exceed 128,822 lbs. for quota period number 2, extending from January 1, 1943 to March 31, 1943.

7. The defendants' quota of "controlled meat" of the type described as "veal" in Restriction Order Number 1 did not exceed 172,231 lbs. for quota period number 2, extending from January 1, 1943, to March 31, 1943.

8. During the quota period number 1, the defendants slaughtered and delivered "controlled meat" of the type described as "beef" in Restriction Order Number 1, in excess of 323,547 lbs.

9. During the quota period number 1, the defendants slaughtered and delivered "controlled meat" of the type described as "veal" in Restriction Order Number 1, in excess of 227,394 lbs.

10. During the quota period number 2, the defendants slaughtered and delivered "controlled meat" of the type described as "beef" in Restriction Order Number 1, in excess of 190,790 lbs.

11. During the quota period number 2, the defendants slaughtered and delivered

"controlled meat" of the type described as "veal" in Restriction Order Number 1, in excess of 199,580 lbs.

12. The United States of America is in a state of national emergency, which requires the strict compliance with the Acts of Congress and regulations promulgated pursuant thereto, which are here involved, by all those within the provisions of such Acts and regulations.

## Discussion

■ The first question presented for consideration is, whether or not the defendants have slaughtered and delivered certain types of meat designated in Restriction Order Number 1 as "controlled meat" in excess of the amount they were permitted to slaughter under the appropriate quota regulations of that order. The Restriction Order provides that the first quota period under the regulations shall begin October 1, 1942 and extend to December 31, 1942. During that period, as provided in the original Restriction Order, the "slaughterer" might deliver an amount of "controlled meat" of a type designated as "beef" not to exceed 80% of the amount of such type of meat which was delivered during the period from October 1, 1941 to December 31, 1941. This Restriction Order was amended November 7, 1942, to provide that the amount of "beef" that could be delivered during the first quota period should not exceed 70% of the amount of "beef" delivered during the period from October 1, 1941, to December 31, 1941; provided, however, that any "slaughterer" who had already delivered, November 7, 1942, more than 70%, but not more than 80%, of the amount of "beef" delivered during the base period would not be in violation of the Restriction Order, and that any deliveries in excess of 70% of deliveries in the base period would be charged against the next quota. There is no evidence here that the defendants delivered more than 70% of their quota prior to November 7, 1942; consequently, this case will be governed by the Restriction Order Number 1, as amended. During the first quota period, the "slaughterer" was allowed to deliver an amount of "controlled meat" of a type designated as "veal" not to exceed 100% of the amount of such type of meat which was delivered during the period from October 1, 1941 to December 31, 1941.

The second quota period as established by Restriction Order Number 1 extends from January 1, 1943, to March 31, 1943. During the second quota period, the "slaughterer" is allowed to deliver an amount of "beef" not to exceed 70% of the amount of "beef" delivered during the period from January 1, 1941, to March 31, 1941, and an amount of "veal" not to exceed 70% of the amount of "veal" delivered during the period from January 1, 1941, to March 31, 1941.

The evidence of the plaintiff consists of certain records obtained from the Department of Agriculture of the Commonwealth of Pennsylvania and records of the Department of Health of the City of Scranton, Pennsylvania. These records show, inter alia, the number of cattle and of calves inspected by these departments. From and after March 7, 1941, all cattle and calves slaughtered by the defendants were inspected by the Department of Agriculture of the Commonwealth of Pennsylvania and, during the period from January 1, 1941, to March 31, 1941, eighty per cent. (80%) of the cattle and sixty seven per cent. (67%) of the calves slaughtered by the defendants were inspected by the Department of Health of the City of Scranton, Pennsylvania, the remaining twenty (20) and thirty-three (33) per cent. were not inspected because not sold within the Scranton area. The plaintiff, by use of a figure admitted by the defendants to be the correct average conversion weight of cattle and of calves slaughtered in 1941, converted the number of cattle and calves slaughtered as revealed by the records above described into pounds of meat produced. The result of these computations may be summarized in part as follows: From January 1, 1941, to March 31, 1941, the defendants delivered 104,025 pounds of "beef" and 164,850 pounds of "veal" which, used as a base for establishing the defendants' quotas for the second quota period, that is, the period from January 1, 1943, to March 31, 1943, fixes a quota of 72,818 pounds of "beef" and 115,395 pounds of "veal"; from October 1, 1941, to December 31, 1941, the defendants delivered 288,325 pounds of "beef" and 226,030 pounds of "veal" and establishes quotas for the first quota period; that is, the period from October 1, 1942, to December 31, 1942; of 201,828 pounds of "beef" and 226,030 pounds of "veal".

Herman Kramer, one of the defendants, testified that on January 1, 1941, the defendants had in storage 54,000 pounds of "beef"; that, during the period from October 1, 1942, to December 31, 1942, the defendants delivered 323,547 pounds of "beef" and 227,394 pounds of "veal"; that, during the period from January 1, 1943, to March 8, 1943, the defendants delivered 190,790 pounds of "beef" and 199,580 pounds of "veal"; and that the defendants delivered approximately the same amount of "beef" and "veal" in 1941 as they did in 1942. The defendant, Herman Kramer, also testified as to his conclusions as to the proper amount of the defendants' quota for the second quota period but did not state how he arrived at the figure given and, consequently, his testimony as to his conclusions cannot be considered.

The defendant, Herman Kramer, testified that in the first quota period, October 1, 1942, to December 31, 1942, the defendants delivered 323,547 pounds of "beef" as against 553,375 pounds of "beef" shown in plaintiff's computations. It was admitted by defendants that they had delivered in the same period 227,394 pounds of "veal" as against 351,260 pounds of "veal" shown in plaintiff's computations. Under the creditable evidence most favorable to defendants, i. e., that their deliveries during the comparable period of 1941 were the same as those in 1942, the defendants' quota of "beef" for the first quota period would be 226,483 pounds, which is 70% of the amount of "beef" admitted to have been delivered in the first quota period. Therefore, the defendants have delivered 97,064 pounds of "beef" in excess of their quota during the first quota period under their own admissions. Since they were entitled to deliver 100% of the amount of "veal" delivered in the corresponding period of 1941, and, assuming the amount of "veal" delivered in the first quota period was the same as the amount of "veal" delivered in the corresponding period of 1941 or base period, the defendants did not exceed their quota of "veal" in the first quota period.

In regard to the second quota period, Herman Kramer testified that the defendants delivered 190,790 pounds of "beef" as against 276,925 pounds of "beef" shown in plaintiff's computations and that they delivered 199,580 pounds of "veal" as against 267,610 pounds of "veal" shown in plaintiff's computations. The only reliable evidence offered as to the amount of "beef" and "veal" delivered by the defendants in the base period for the second quota is that offered by the plaintiff and revealed by plaintiff's computations. Again, under the creditable evidence most favorable to the defendants, that is, that the plaintiff's computation ignores twenty percent. of the "beef" delivered by them and thirty-three percent. of the "veal" delivered by them because the records relied upon were incomplete to that extent, and that the defendants had in storage 54,000 pounds of "beef" on January 1, 1941, the amount of "beef" delivered by the defendants during the base period was 184,031 pounds, and the defendants' quota of "beef" for the second quota period would be 128,822 pounds; and the amount of "veal" delivered by the defendants during the base period was 246,045 pounds, and the defendants' quota of "veal" for the second quota period would be 172,231 pounds. Therefore, in the second quota period, the defendants have exceeded their quota of "beef" by at least 61,961 pounds and their quota of "veal" by at least 27,349 pounds. Under the creditable evidence most favorable to the defendants, it is obvious that they have exceeded their quotas of "beef" by not less than 159,032 pounds, and their quotas of "veal" by not less than 27,349 pounds. While it is clear from the evidence that the defendants have violated the Act, the extent of such violation is not here considered except as to a minimum figure below which the average of the defendants will not fall.

Counsel for the defendants in his argument stressed the applicability here of a "catch" expression that the "Office of Price Administration does not have exclusive rights to all the patriotism in America". With this statement I do not disagree, but the truth of that expression should not, and cannot, cast doubt upon the patriotism of the Office of Price Administration and its members. However, it should be borne in mind that it is not the function of a Court to measure patriotism in these proceedings. The sole question here is one of violation of the laws of the United States of America. This case reveals a clear and substantial violation of one of those laws. In presenting the case, the Office of Price Administration is merely performing a duty imposed upon it just as the Court in deciding the case is per-

forming a duty imposed upon it. If the patriotism of the parties is incidentally revealed by the facts shown in connection with these proceedings, the duty of recognizing it and commenting upon it is not for the Court.

September 8, 1939, the President proclaimed a state of national emergency. Thereafter, pursuant to Acts of Congress, various administrative agencies have been created to preserve and secure to the people of this nation the resources and products of the nation. One of these Acts of Congress and one of these agencies are involved in this case. There can be no question as to the existence of the national emergency. The only question is, whether the acts sought to be enjoined by the plaintiff have such direct relation to that national emergency that the public in whose behalf this action is brought will be irreparably injured if the defendants are not enjoined. No direct evidence has been offered as to this essential element of plaintiff's application.

█ Restriction Order Number 1 was promulgated for the purpose of limiting the amount of "controlled meat" which may be slaughtered and delivered during a particular period of time. The Court will take judicial cognizance of the fact that the food resources of this country are insufficient to satisfy an unrestricted demand for such food products. From this fact, the conclusion is inescapable that the future welfare of the people requires that such food products be conserved. Restriction Order Number 1 is a course adopted by the Government to effectuate that conservation, and, in my opinion, it was reasonably designed to accomplish such conservation. It clearly appears, therefore, that, if the defendants are permitted to slaughter and deliver cattle and calves in excess of the amount permitted by Restriction Order Number 1 they will, to the extent of such excess, deplete · the reserves of such "controlled meat" which the Office of Price Administration has found it necessary to maintain in order to assure adequate supplies of such "controlled meat" for future needs. The injury occasioned by such depletion is obviously irreparable.

█ The irreparable injury which will occur if the violation of Restriction Order Number 1 is unrestrained in this case will of itself have but little effect upon the people of this nation as a whole. However, the basis upon which I rest my decision to temporarily enjoin these defendants is much broader. The national emergency has created a need for a great number of restrictive measures, only one of which is here under consideration. These measures can be effective only if obeyed. The task of seeking the enforcement of these measures has been entrusted to the various departments and agencies of the Government and the function of the courts in assisting in this enforcement is obvious. In the discharge of their duties, the courts must consider the entire problem of conservation and equitable distribution. In so doing, each particular violation of these restrictive measures must be considered as affecting the whole plan for the preservation and security to our people of the resources and products of the nation. No one court has jurisdiction over all violations nor the opportunity to consider judicially all violations, but to say that because of such a situation each court in considering the comparatively slight effect of one violation must for that reason deny an application seeking the enjoinder of such violation is idle sophistry. If we are to obtain the desired results from the efforts of our Government, each violation of the regulations designed to secure to our people the resources and products of our nation during the emergency must be restrained.

## Conclusions of Law

1. The defendants have violated the provisions of Restriction Order Number 1, promulgated pursuant to the provisions of Section 2(a) of Public Law 671, 54 Stat. 676, as amended.

2. If the defendants are not restrained and enjoined from further violating the provisions of Restriction Order Number 1, immediate and irreparable injury will result to the people of the United States of America in whose behalf this application is made.

█ 3. The Court will take judicial knowledge of the present state of national emergency insofar as that emergency creates a condition which will render irreparable the injury occasioned by violations of the Acts of Congress and regulations here under consideration.

█ 4. A temporary injunction should be granted enjoining the defendants from further violating Restriction Order Number 1 pending the disposition of this case.